Good morning, Your Honors. I'm Brenna Bell for Appellant Bark, and with me at Council's table is Dave Becker. I'm planning on reserving five minutes for my rebuttal. Of the more than 2,000 acres planned for the Jazz Timber Sale, only nine acres are designated for commercial logging, for timber emphasis. The rest of the project is set aside by the Northwest Forest Plant for protection and restoration. Commercial logging in this area is highly constrained. This is one of the reasons that Bark's staff and volunteers have spent over 1,000 acres in the project area, walking every unit, gathering high-quality, site-specific information that we then made available to the Forest Service in the NEPA process to help them make a well-reasoned decision about the best approach to active management in this very protected watershed. In a large part, the Forest Service did not incorporate Bark's information in its EA or analyze Bark's proposed alternatives in detail, giving rise to the claims before the Court. Well, the government takes a position that none of Bark's alternatives were economically feasible. Do you think that characterization is unfair? That's their post hoc rationalization and litigation. If you go back to the record and look at the exact language that they have with Bark's alternatives, you'll find something very different. I actually pulled it up. So at the record at ER 250, the Forest Service does an interesting thing. Did you say 250? Yes, 250. Bark suggested three separate alternatives to be looked at either individually or in combination. That's at ER 113. Those alternatives were to remove the logging from late successional reserves and riparian reserves, to remove the portions of the project that required to do ground-based yarding on high-impact earth flows because that is in violation of two of the forest plan standards, and or to remove all the units that required rebuilding already decommissioned roads. Because there's 12 miles of roads that are already decommissioned that they would have to rebuild. Those were the three alternatives. If you look at their analysis, the first thing they do is conflate thinning in riparian reserves, thinning in LSRs, and an alternative that we never suggested, which is deleting thinning in earth flows altogether. All we suggest is they don't do ground-based yarding, which is tractor yarding on these very highly unstable areas. So they conflate these three different things and then say, well, that would remove three-quarters of the project. They don't speak to economic unviability at all. They simply say, quote, this option was considered. They're essentially saying it's smaller, therefore we don't want to do it. And in fact, you take the position that if they had just done no ground-based thinning, it only would have taken 100 acres out of play, right? Correct. So then that brings me to my next question, which is, are you aware of a case in which a lower court was reversed for having failed to consider another proposal when it did consider action and no action? Well, this court reversed the lower court in Western Watersheds Project v. Abbey fairly recently on a very similar issue. Well, that's because in that case, though, weren't all of the proposals essentially, all the alternative proposals actually were either action or no action? I can't remember which or what it was. They were. Even the no action alternative in that case was action. Right. However, the court specifically said that they were, quote, troubled by the agency's refusal to look at a reduced grazing alternative as well as a no grazing alternative, and said that it was reasonable to believe that something less than 3,120 animals grazing would still meet the project's purpose and need in a way that better met the objectives of the protected monument. So the fact that there was not a reduced grazing alternative as well as a no grazing alternative gave rise to the court's reversal. Okay. So let's say that, so maybe taking your point that this is an ex post rationalization, don't we nonetheless need to consider as a reviewing court whether the project would be economically viable because it isn't one of the purposes to produce lumber? Well, specifically for riparian reserves, they are not included in the timber base for the Northwest Forest Plan. Commercial logging and riparian reserves, the starting place is that commercial timber is prohibited. So we're looking at the agency planning a sale on a whole lot of land that is not designated for commercial logging. So economic viability is not actually a key factor in making this decision. This court has to look at the fact that this land is set aside for watershed protection and restoration, and what the Forest Service has done is overlay it with a commercial timber sale that looks a lot like the commercial timber sales that they're doing all through the rest of the forest on land that is designated for that. And so economic viability, while it might hold a place, it's not in the record at all, and you can't judge for yourselves whether or not that it's viable. The agency is, you know, if they had made that determination, then that would be something the court should defer to. So is economic viability the same as commercial? I thought commercial was to make money and the economic viability was to fund their project. Am I wrong on that, or is that they seem like distinct issues? Well, commercial logging is logging that the Forest Service will sell the timber, and there is non-commercial logging projects. A lot of the restoration projects do not have a commercial component and are funded through a different mechanism. However, that's not really been an issue in this case. The only alternative that it found as economically unviable was increasing helicopter logging, which no commenter actually suggested, and they refused to look at anything that would decrease the amount of acres treated through a commercial logging project. So we assert that this court should follow Western Watersheds Project, which, you know, strangely, opposing counsel didn't address in their brief, because it's a directly on-point situation where there's land with a protected designation, where there was a suggestion to do a reduced alternative. Like right here, we're looking at something that would have logged 375,000 trees, rebuild 12 miles of decommissioned roads, or nothing. I understood the government's argument to be that their goal was to thin this plantation-style planting for health of the area, and they characterized BARC's proposal as leaving 90% or more untouched. So regardless of economic viability or commercial use, it wouldn't fulfill the goals. That's what I understood to be their argument. Correct. That's what's in the record. They got to that by conflating BARC's proposed alternatives and actually even expanding them. So did BARC submit a proposal that would have, like, 60% or 70% of the area thinned? Yes. And which proposal was that? We had three different alternatives that we said, which was not thinning in late succession reserves or repairing reserves, which would have deleted about half of the acreage, not doing ground-based yarding in earth flows, which would have only removed 100 acres, but that's a very important 100 acres, because it would have meant they didn't have to exempt themselves from complying with two forest plan standards that they are violating, because there should standards, so they can exempt themselves, or not rebuilding roads, which would have left about 60% of the sale, but removed a huge amount of the environmental impact. I thought they could do the logging without making roads. I thought that was where the helicopters came in. The thing they didn't analyze is they said, well, we could do the logging without building roads, but then we'd just have to do it with helicopters, and that's not viable. What BARC suggested is remove the units that require rebuilding these roads, over half of which they've already spent the time and money actively decommissioning. They just reduced the sale and the acreage. You know from a prior question that I know about the 100 acres only, but where would I find in the record that it would be about a 50% reduction from not thinning, or that about 60% of the logging would remain from the not rebuilding the roads? All right, let me look. We had that in our briefing, though somehow the sites are not jumping out at me in this moment. If it's in the brief, I can find it. That's all right. Thank you. All right, I think the next main topic to talk about is when deference is appropriate and how in this case the court should not defer to the agency's findings on the NEPA issues. The starting place for deference, of course, is Land Council v. McNair.  the agency makes a rational connection between the facts found and the conclusions reached and how it got there. This, of course, assumes that the agency starts with an analysis with all of the relevant facts. And in this case, there are several relevant facts that are missing from the agency's NEPA analysis, facts that BARC provided the Forest Service and encouraged them to use in our comments and appeals, but were not included. When all the facts in the record are looked at, there is little rational connection between the facts and the conclusions that the Forest Service reached. Now, in a large part, this is because they don't have baseline information. The issue of roads, I keep coming back to it because it's a huge issue on the Kalawash watershed. As you've seen, the Forest Service itself planned a major project to decommission roads because they see that that is the biggest impact to water quality in the Kalawash is the presence of roads. Now they're going into very protected areas and saying, we are going to rebuild 12 miles of road that are already decommissioned and recovering, but act like it's actually not a very big deal. And we're not going to give specific details about the hydrologic recovery of each segment, just assertions of historical action. Did we, was it actively decommissioned or passively decommissioned? Now, BARC went out, as I said, spent hundreds of hours gathering high-quality site-specific information and engaging a hydrology expert to look at the impacts on the ground of what this would look like, submitted this to the Forest Service, asked to be included in the analysis once, and they withdrew their decision. And we said, great, it will be in the next EA. And they resubmitted another EA that did not include that information. So again, we went out, got information, and submitted to the Forest Service that clearly showed, if you looked at the facts, that they're not going to improve water quality by rebuilding 12 miles of road that are already decommissioned. That's going to set back the recovery for years in a protected watershed. The government says that the information, first, the information from the volunteers was not the sort of scientific information they can use. And second, that their own expert disagreed with BARC's hydrology expert, and we should defer to their expert under McNair. What's your response to that? Well, the first being that the Forest Service actually never disagreed with any of the information that BARC submitted, nor did their expert disagree with BARC's hydrology expert. They simply omitted the information from their analysis. Second, I would pose the defense counsel— I thought their expert said that there was a difference between active and passive decommissioning and that active decommissioning was important for soil structure. I don't understand exactly the scientific terminology they used, but that was the gist of it. As far as I can tell from reading the soil scientists' reports, there are charts that show whether the roads in question were compacted or decompacted, but again, that is a statement of historical act and not whether or not they're in some state of hydrologic recovery. They didn't actually engage themselves with the vast amount of science that BARC's hydrology expert did present from site-specific visits and other studies about the long-term impacts that happen after you decommission a road. The Forest Service, in some ways, is saying, well, you know, they're speaking out of both sides of their mouth. Well, these roads are decommissioned, but they're not really recovered is the first thing they're saying. And then, at the same time, they're also saying, but immediately after we re-decommission them, they will stop contributing to sediment in the watershed. And the truth is somewhere in the middle, because every single one of these roads is in a different state of hydrologic recovery, and BARC gave them information about that, which was not incorporated. Now, an agency, you know, you should defer to an agency's science if there's conflicting scientific evidence, but the agency must actually address the conflict and must actually explain the conclusions it has drawn from its chosen methodology and the reasons that it, you know, considers that underlying evidence to be reliable. Well, one basis for the government's conclusion is that after the process of active decommissioning, things will actually be better off than they were if nothing were to happen. Is there scientific information in the record to show that after active decommissioning, in fact, the roads won't be better? Well, there's two things. One, remember, over half of the roads have already been actively decommissioned. So there's nothing that shows that those will be in a better condition after this. And second, there is a chart prepared by BARC's hydrologists. It's the only thing that makes a comparison between action and no action, and that's ER 660 and 661 is that chart, and it should give you an idea of the comparison between the baseline of not acting at all with the roads in the state that they're in and what it would be if they kind of reopened, like picked off the scab, basically, to a recovering wound, which is what the road is. So we submit that in this case, deference is not appropriate because the facts on the ground clearly show this will increase sediment in the watershed and it will decrease the source material for large woody debris,  And because they don't have high-quality information around the facts, they aren't able to make a reasoned decision or conclusion. Isn't the science record on recruitment of woody debris into the stream pretty good for the government? I mean, tell me, that was a broad question. Why is that wrong? Why is what I just said wrong? There is scientific evidence in the record about how far away from the stream the woody debris has to be for recruitment to occur. There is a clear statement of what buffers there will be so that that woody debris will not be removed or disturbed. Sure. On a deferential standard review, why isn't that good enough? I'll answer your question, and then I want to rest for rebuttal. So the facts are that the project area is already deficient in large woody debris. And this isn't just for streams. That might be true for the aquatic conservation strategy, but overall for soil productivity, large woody debris is very important. Then the facts are also clear in the record that the jazz timber sale would result in a loss of large woody debris recruitment for at least the next 50 years. The EA admits as much. The Forest Service makes an unsupported assertion that this is sufficient for soil productivity, but we have specific science that says that you need to have the long-term decomposition of large woody debris to maintain soil productivity. But you asked specifically about large woody debris in the streams. The Forest Service relies on two studies. Both of those studies look at old growth and non-disturbed areas, neither of which are applicable to the Kalawash watershed, which everyone agrees is recovering from clear-cutting. We submitted many different studies that give a very different conclusion. And if you look at what the Forest Service said about this, it recognizes that there's a scientific controversy. At ER 309, it recognizes that public comment suggested that, quote, recent research points to a conclusion that thinning reduces the quantity of woody debris available to streams. Its conclusion is these papers were examined. That's it. It doesn't actually describe why the papers that John Rhodes includes in his hydrology report, which specifically talk about plantation thinning and large woody debris, are not more on point than the ones where it looks at old growth. And finally, for the purposes of the aquatic conservation strategy, the standard is to maintain and restore structural diversity in large woody debris. By removing large woody debris, both now and in the future, they neither maintain nor restore it. So even if the buffers keep the worst from happening, they are not restoring the conditions by removing the input. Okay, that's fine. Thank you. May it please the Court. My name is Robert Oakley. I'm here on behalf of the Forest Service. Also sitting at counsel's table is Mr. Molinelli. He represents the intervener in this case. We're splitting our time 14-6. I know it's my responsibility to keep my eyes on the clock, so let me get started. First, I want to frame this discussion on a key point. This project is addressing not any old-growth forest. It's addressing areas that were clear-cut and then planted plantation-style, that is, very thick trees, with the assumption that they would continue to be harvested in a clear-cutting manner. The proposal here actually came from this Clackamas Stewardship Project, which is discussed. Several members of that group filed an amicus brief and talked about why this project was suggested. It was they agreed with it. Bark actually dropped out of the group because of the project. And they recognized that this project would allow the forest to be returned to a more natural situation and move much more quickly to a late successional forest, as opposed to this artificial system that you have now, trees planted closely together that are not going to grow in diameter, that are going to die, and that there's an absence of other things like skips and gaps, which create either openings for wildlife or provide, in some cases, very thick shade for other types of wildlife that need it. So this project, if we dial down this project, we dial down the economic benefits, and we disappoint people who were working with the Forest Service to improve this forest. Now, there were a number of statements about post hoc and, I don't know, Ms. Bell must have something wrong with her administrative record. First, she asserted that the Forest Service statement about this project not being economically viable was something I thought of. If you look at the environmental assessment, page 244, it could not be plainer. The Forest Service is responding to Bark's proposal. There would only remain about 100 acres or 5% of the proposed action. And in the sentence before this, it says, if considered as an alternative, the remaining acres would not be economically viable. And it explains why this would be. These remaining acres would likely be viable by themselves because they would not have sufficient value to cover the cost of necessary road repairs along the haul routes. Also, if you look at the decision document, that's in the ER at 179. The Forest Service says, look, we cannot do this project if we don't thin the timber and have some commercial component to it. So the projects did. The post hoc, the true post hoc rationalization, because it comes in Bark's reply brief, is this business about, oh, we propose something that would only be 100 acres and you could go ahead. Look in the record. You don't even find it in their opening brief. They never made that proposal to the Forest Service. Instead, they give a laundry list. They say you should, and they connect them all by and or or. So it's like a Chinese menu. You can, they want the Forest Service to pick this out. But they never. There's something unclear about the word or. I'm sorry? There's something unclear about the word or. It's the government's position. It's and or. Excuse me. No. Excuse me. No, let me talk. They never separately proposed, for example, no ground-based skidding, if I'm getting that right, as a stand-alone? They linked them by and or. So it's either don't do any of this or don't do parts of this. Did the government ever separately consider just that item as a stand-alone? No, it did not. It looked at all of these, and it concluded that if it did some of them, the project would drop to 75 percent. And if it did all of them, it would drop by 95 percent. And the project, the proposals, and this is why I was harping on the and or. They expect the they claim that the burden is on the government to go through and say pick out units and make distinctions that BARC is unable to make itself. That is to say, well, we really think these late successional reserves are crucial here, so you should set them aside. It's unclear at this point what the government could have proposed other than either a 95 percent or a 100 percent reduction that would have prevented this lawsuit. BARC has never identified that. But most importantly, they didn't identify it in their comments. Even in some of their appeals administratively, there was some discussion of limitation. But in their comments, they just listed everything that they'd like and say and or, and or, and or. And so the Forest Service, without any meaningful standard to apply here, looked at them and said, well, we do one and or, and we're down 75 percent. We add another one in, and we're down 95 percent. So there's simply, that is not in the record. The 100 acres, which sounds reasonable. Who knows? But when it pops up in a reply brief, not in the comments, not in the scoping process, then under Vermont Yankee, that's too late. We can't come here today and negotiate a settlement or address this. And that's one of their big failures. Now, on the Western Watersheds case, I think this point may have been picked up, but in Western Watersheds, the government's position was it had no alternative on the activity at issue there, which was grazing. The government believed it had to renew the grazing at the same level. So not only were lesser grading not considered, there was no action proposal was considered by the government. And here we do have a no action proposal, which looks pretty much like a 95 percent proposal by BARC. And again, if we do that, what's going to happen is we're going to leave these overcrowded stands that will either have to be cleaned up later, or if we don't do anything at all, if we set them aside and say just let them go, we're not going to manage the forest at all. We're just going to have dead and dying trees, small trees. They talk about large woody debris. These trees are on average 9 or 10 inches, and as the Forest Service says, they're unlikely to get any thicker in diameter because they're so crowded. They're competing for water. They're competing for sun. Now, going to the EA and EIS, again, I think there's a big difference here on our view of the record. BARC claims that the Forest Service lacks a baseline level for the status of these roads, which had temporary roads, some of which are going to be reopened, and some of which have been decommissioned, but others have not. But if you look at the EA, there's a table. This is ER 523, 525, and it goes through each unit, and it shows you what's the current status. And by the way, there was a reference to historical status. There was actually a table before that. The soil scientists went out and revised the standard or revised the condition of the forest because the soil scientists looked at each one of these parcels, whereas Mr. Rhodes, I believe in his declaration that he was out there for two days and he was looking at other things as well. So the table, though, at 523, 525 in the ER says this is where it is now after checking, this is how it's going to improve, and this is where it's going to be. Now, you don't get much more specific than that when you go through three pages of a table and there's an extended spreadsheet behind that that will give you even more information. Mr. Rhodes just engages these generalizations. As to Barks Volunteers, they may be well-meaning, but there's no showing that they have any expertise. Plus, the government soil scientists looked at this and explained why you could see a decommissioned or, I'm sorry, a road, a temporary road that had not been actively decommissioned, and you could say, well, look, I can see plants. I can even see a tree on it. It must have recovered. Compaction is not even across the entire surface of the road. So there could be some area within the non-decommissioned road, which has recovered enough, and then some tree gets planted, seeds get there, it grows, and to a layperson like Barks Volunteers, they're going to say, great, this has recovered. We don't need to do anything about this at all. But, in fact, the soil is still suffering. And that is not a guess. This person, the soil scientist's report could not have much more detail in those tables. So the government both provided the economic, I'm sorry, provided the baseline, and it provided explanation for why Barks people were wrong. The government has the right to rely on its own experts here. And especially when even if there were a lesser standard, the government's expert provided far more detail and explained her methodology in her report about how she went out, and she wasn't content to just rely on the records as they then existed about how the soil compaction was, but she actually revised those to address other problems. And actually, I will be, to be completely candid with the Court, there were a couple of units where she, and this is disclosed in the EA, where the compaction will not get better. There are only a handful. Overall, it's going to benefit most of the units. But this is the level of honesty and detail that the government provided. Where it found that there wouldn't be an improvement, it said there wouldn't be an improvement. And that's, but that's the only obligation underneath it. It is to be open here, and the government could not have been more open on the status of the soils. So I'm going to turn it over to Mr. Molinelli in just a second, but I just want to go back again. This is a forest which is different from many of the others that this Court has to deal with. Nobody is talking about this part of it, a wilderness area or any of those issues. This was commercially logged. Our views and knowledge about what commercial logging does to forests have changed. And so the Forest Service, in collaboration with these other groups, is trying to do this through stewardship contracts, which are contracts where the money from, at least for some of these extending projects, the money will go to carry out these projects, to do things like put in skips and gaps, to improve conditions in the late successional reserves. And because the EA and the Forest Service conclude that otherwise they won't be able to meet those standards. Before you sit down, it would be helpful if you just addressed for a few minutes the NIFMA claims. Well, the NIFMA claims are, yes, those are the aquatic conservation standard claims. And when they say standard, are they just goals or are they mandatory standards? I believe they're objectives is the correct word. And the Forest Service is supposed to either, it can maintain them, it can also take action, affirmative action, to restore them or to improve them. And I just cannot believe if this is BART's argument, and I'm not sure that it is, that absolutely nothing can be done that even for the shortest period of time causes some decline. If that's the case, I mean, even though that short-term decline would lead to some long-term improvement, the latter is disallowed. I mean, that just doesn't make sense. It's not clear to me from their briefs where they are. But in terms of the aquatic standards, on one of them there's concern about sediment. Well, they put it in the context of the roads, the temporary roads that are now going to be reopened. There's no miscalculation here. There are two ways of looking at it. One is to increase sediment over natural loadings by 0.01 percent, one hundredth of one percent. A different way of looking at it is 0.07 hundredths of one percent, and these are both over natural loading. Well, but BART says that that estimate does not include the sediment generated from the approximately 3,500 log trucks that would be needed to take this lumber out of the forest. Is that wrong? I mean, I don't believe that it is, but even if it is, that second point... Well, if it's not wrong, then doesn't the government have to provide some data on that impact unless it's impractical to do that? Isn't that the standard? It's what the government refers to, and this is backed up by another agency which looked at impacts in terms of streams, and this is the National Marine Fisheries Service. It's going to be insignificant. We're not even now getting to the level of hundredths of one percent of natural loading. Does that satisfy the test that you and I agree is the test? It seems to me it does because... Is that data, or is that a finding of impracticality? Which one of those is it? I'm sorry, it's not data. I didn't hear you. Well, the question is, so my assumption is that the government has to provide data on the impact of these 3,500 trucks unless it's impractical to do that, and you said, yes, Your Honor, there's this National Marine Fisheries Study, and so my question for you is, is that the data, or is that a point in support of the argument that it's impractical to provide the data because it has to be one of those two, doesn't it? Well, I'm sorry. Yes, I did not hear your question. I'll back up. Maybe I'm asking a question poorly. There's no data on the impact of the 3,500 trucks, right? There's not a quantified number. Okay. And the requirement is that there be such data unless it's impractical to provide it, correct? To me, I believe it's picked up by the tonnage. But I just want to see, do we agree that that's the test? I believe you're correct, Your Honor. I'd like to look at my regulations, but I'm sure you're, you know, you're looking at something. And now I'm getting close to Mr. Just make sure you've answered, Judge. I'll give you plenty of time. Don't worry. Just sit down. So my question is, just on this point, was the data provided or is there something from which I could conclude it was impractical? If that's the test, that's all. I don't recall a specific figure broken out for the amount of sediment generated by the trucks, no. I believe it was simply classified as, I know it was classified as insignificant. Then if I don't have the data and let's say that Judge Pius were nice enough to assign me to write the opinion, is there something that I could use to conclude that it would be impractical to provide the data? Not that I know of, but to be honest, I would like to look at my record very quickly. I don't know. I'm not going to get another chance to speak, I know. But as to whether it's picked up in the numbers, because we're talking about trucks riding on them. So it would seem to me it would have to be within that either .01 or .07 percent. But I don't want to misrepresent the facts of this Court. And as I stand here, I'm not 100 percent certain. I thought the EA had included mitigation measures in that. It's the way it addressed the logging trucks was to have best management practices to mitigate any effects. Is that correct? That is correct. Both there and on a number of aspects raised by BART. The EA mitigates. This project will mitigate impacts whether it's from sediment, invasive species, other measures. There are mitigation measures required to be imposed on this project such that the harms will be limited. Thank you. Okay. Thank you. Now we can hear from you. May it please the Court. My name is Robert Molinelli, and I represent the intervener, Interfor, in this case. I just want to make a few quick points about some questions that were discussed earlier. First, with regard to the impacts of log haul, we discussed that in our brief at page 25. And I believe the discussion of the mitigation measures related to log haul is in the Exerts of Record at 281. And the agency found the effects to be immeasurable based on the best management practices they instituted. So by immeasurable, you mean insignificant? Is that? They used the term immeasurable. It's so small that you can't measure it. Your Honor, that's the term they used in the EA. The next point is on Western Watersheds Project versus Abbey. The language this Court used was that they were troubled by BLM's decision not to consider a reduced or no-grazing alternative. And they were specifically troubled by the comparison of the alternatives because it did not, I believe it says, this Court said, we question how the agency can make an informed decision on the project's environmental impacts when each alternative considered would authorize the same underlying action. There is no meaningful difference. Here, there is a meaningful difference between the two alternatives. And I think in examining whether this is a reasonable range of alternatives, you have to look at the purpose and need statement. The case for that is Native Ecosystems Council. And here, ER 197, it says, the purpose of this project is to increase the health and growth of trees and to enhance diversity within riparian reserves, late successional reserves, and matrix land allocations within the project area. So picking up on Mr. Oakley's description of the proposals that BARC made, I think the language that they put in at 113 of the record is one or all of the following changes. And then they listed the three changes they were proposing. And it's true that they didn't put in this 100-acre number until their reply brief, but presumably it's in the jazz-thinning documents what the acreage for ground-based yarding is. So everybody knows what the 100 acres is. Why shouldn't we be troubled by the failure to consider that as a standalone alternative? Your Honor, I think Native Ecosystems is on point, and they basically said that the agency doesn't have an obligation to consider alternatives that are essentially the same. So the agency's expert went out to the field and looked at those units, determined that stability was not a concern. And because it was only 100 acres, an alternative that would subtract those areas, which it verified as not being a concern, would be essentially the same as the proposed action. I only have a few seconds left, so I'd like to conclude by saying, determine whether an EIS is required. You look at the context and intensity of an action. Here we're talking about previous clear cuts. We're talking about an existing road system and road alignments. And we're talking about a thinning project designed to increase the health and growth of the stands. Thank you, Your Honor. Thank you. Okay. We have some rebuttal time. There's a lot to work with here. First, I'd like to give you those record sites. The acreage in high-risk earth flows we actually pulled out of the maps. They're found on the excerpts of record 329 through 331. And the acreage in the riparian reserves and LSRs is in ER 207 to 208. I think it's important to remember that it's the duty of the agency to develop, study, and study reasonable alternatives to an action. It's not the duty of the public, even though we can assist the agency in completing its duty. But the statutory duty under 1022E of NEPA clearly places that on the agency. Here the agency is essentially trying to avoid that duty by creating different configurations of BARC's proposed alternative to get them out of studying it. We did not propose no action. No action is no action. We proposed several different ways that this timber sale in protected areas could go forward and avoid some of the, what we consider and what the expert hydrologist considers, some of the most important environmental impacts. The very reasons this area is protected is because it's very unstable in these earth flows. It's highly compacted. It's in recovery from being a clear cut, and it's important for riparian health. All of BARC's different alternatives better meet those protective standards, very much like the reduced grazing alternative in Western Watersheds Project, where this court found that the existence of a viable but unexamined alternative renders an EA invalid. So we ask that you follow Western Watersheds and specifically, you know, define. Would that comment in Western Watersheds be properly characterized as dictum? They were wistful about the absence of an alternative no one had given them, right? Well, I think that they thought that the agency could have given them that alternative. It had analyzed it, and they vacated the decision and sent it back for the agency to look at something like that. We ask that this court does that also. I want to address the specific question around the sediment logging trucks. The 19 tons doesn't include the logging trucks, the 0.07 percent. That was only looking at the impacts of building, rebuilding, and decommissioning roads. Is there a law on the question of what the court, to what degree does the court defer, if that's the right word, to the assumption that best practices will be followed? Because obviously if they are followed, then we should likely defer to the agency's conclusion that any sediment impact will be insignificant or immeasurable. That is a ripe question. And I think that one could assume that best management practices are followed. However, in this case, even that assumption doesn't mean it's going to mitigate the impact to zero. If you look at the studies in the record that specifically talk about logging impacts, they find that there's 100 times greater impact from logging, from hauling, on roads that are not being used than roads that are being used. There's 100 times greater. But if they've measured the sediment impact of the roads, qua roads, and it's 0.01 percent, if they're not looking at the trucks but they say if you follow best practices, the truck's contribution of sediment will be immeasurable, doesn't that meet the impractical standard? Well, they don't have, again, we look at what the conflicting science says. BARC posited that there are measurables. There's several studies that show how to measure this. We offered those studies to the Forest Service. They chose not to use them and dismissed the impacts. But even with those impacts, you know, not included, they're still not showing how they're maintaining or restoring the sediment impact because they're not decreasing it beyond the final things. Oh, I'm over, but I have one question. Judge Paz, would you allow me to ask this? Okay. Just one more question. So what about your opponent's point that you don't measure that question of restoring or maintaining at a single moment in time, that you have to have a longer horizon? Correct. We actually agree. He was not adequately representing BARC's litigation perspective. If you look at the increment two decision that the Forest Service did, which decommissioned several hundred of miles of roads, there was a short-term benefit to the watershed, but there was a demonstrated long-term benefit. In this case, they have no demonstrated long-term benefit. In fact, the record shows that they will be over the long term decreasing the health of the watershed in terms of sediment by rebuilding already decommissioned roads. In that case, when there's no restorative end that's been supported by the record, one can't find that the short-term degradation is justified. The standard is to maintain and restore. Currently, they have too much sediment in the regime, so they need to take things or they need to take actions that decrease the amount of sediment to comply with the aquatic conservation strategy. Thank you, Your Honor. Thank you. We appreciate your argument. Counsel, we appreciate your arguments. Thank you very much. The matter is submitted at this time. And that ends our session for today. All rise. This court for this session stands adjourned.
judges: Tigar, Paez, Ikuta